**UNITED STATES of America**

v.

**The UNIVERSITY OF MARYLAND etc., et al.**

**Civ. A. No. M-75-1509.**

United States District Court, D. Maryland.

Sept. 12, 1977.

Alexander C. Ross, Stephen P. Clark, and Christine D. Verploeg, Dept. of Justice, Washington, D.C., for plaintiff.

David H. Feldman, Mary Elizabeth Kurz, Michael W. Lower, and Jack T. Roach, Asst. Attys. Gen., Baltimore, Md., for defendants.

## MEMORANDUM

JAMES R. MILLER, Jr., District Judge.

### Introduction

Plaintiff, Dr. Bettye Thomas, an Assistant Professor in the History Department of the University of Maryland, Baltimore County Campus (UMBC), was the subject of a complaint of employment discrimination filed with the EEOC by the NAACP against UMBC on April 11, 1974, under Title VII of the Civil Rights Act of 1964, as amended March 24, 1972, 42 U.S.C. § 2000e

*et seq.* The matter was referred to the Attorney General by the EEOC for the filing of a civil action pursuant to 42 U.S.C. § 2000e–5(f)(1). Subsequent to the referral by EEOC, Dr. Thomas was notified that her contract of employment would not be renewed beyond the 1975–76 academic year unless she agreed to accept a one year extension of her status as Assistant Professor through the 1976–77 academic year as well as other conditions. This suit was filed against the University of Maryland, its Board of Regents, and Calvin B. T. Lee, at that time Chancellor of UMBC, alleging that the defendants had denied her promotional opportunities on the basis of her race and that she had been denied a standard contract renewal in retaliation for her public allegations of racial discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended.

On July 9, 1976, the court, after a lengthy hearing, denied plaintiff's motion for a preliminary injunction requiring UMBC to retain Dr. Thomas on the payroll. The case came to trial on January 25, 1977, and lasted for eight trial days. Extensive briefs were filed thereafter and final argument took place on March 25, 1977. This Memorandum represents the court's Findings of Fact and Conclusions of Law.

## Facts

UMBC is one of four separate campuses which comprise the University of Maryland, a state university. The campus first enrolled students in September, 1966. Calvin B. T. Lee became Chancellor of UMBC in the fall of 1971. At that time the campus had an enrollment of approximately 3,000 students and a full-time faculty of 150. The present enrollment (*i. e.,* approximately January, 1977) is about 5,600 students and 300 full-time faculty.

In the fall of 1971, approximately 80% of the faculty held the rank of Assistant Professor or lower. Many of the principal administrators at the departmental and divisional levels at that time had little experience in teaching or administration. As of the fall of 1971, the administrators at UMBC relevant to this case were the Chancellor, Dr. Lee, the Vice Chancellor for Academic Affairs, Dr. Morton S. Baratz (who officially took office in January, 1972, but was present on the campus on a part-time basis in the fall of 1971), and the Dean of the Social Sciences Division, Dr. Hugh D. Graham, who took office in September, 1971.

Subsequent to the fall of 1971, the standards for evaluating faculty in the hiring process and in promotion and tenure considerations were significantly upgraded.

When Dean Graham arrived in the fall of 1971, the promotion and tenure process in the Division of Social Sciences was chaotic. Various promotion and tenure decisions had not been completed the prior spring and were still pending. In addition, there were, in the judgment of Dean Graham, an excessive number of teachers at the rank of instructor who had not finished their PhD degrees. Dean Graham set a policy of having firm deadlines for completion of the degrees. Two faculty members (Faculty Member V and Faculty Member W)[1] were terminated subsequently for failing to complete the degrees within their stated deadlines.

The underlying structure of faculty evaluation for promotion and tenure at UMBC and at universities generally is contained in the concept of "peer evaluation." Simply put, that concept requires that the evaluation of an individual candidate be conducted, in the first instance, by the members of the candidate's department who are experts in the candidate's field and who can observe the candidate's performance at close range. The University Administration's role in the process is to review the procedures to ensure that basic safeguards have been ob-

---

1. To protect the privacy of persons not a party to this proceeding, references to personnel actions involving faculty members will be made herein by letter or number. A Glossary correlating the name of the faculty member with the symbols used herein is filed with this Memorandum. The clerk is hereby ordered to seal said Glossary pending further order of the court.

served (*i. e.,* that the Review Committee is composed of those senior in rank to the candidate; that the decision is based on substantial reasons; that the candidate has received notification of the decisions and reasoning behind the decisions and has had an opportunity to respond; that a grievance, if any, has been properly processed); and to ensure that the substantive promotion and tenure standards of the University are being followed.

The procedures for initial promotion and tenure review of faculty at UMBC are contained in the Minutes of the Faculty Senate Meeting of March 17, 1970, and a document entitled "Promotion and Tenure Policies" (DX 190). The Division Chairman (Dean) selects five faculty members senior in rank to the candidate (three from the discipline of the candidate, one from the division but outside the discipline, and one from outside the division) and two students from five nominated by the Council of major students in the discipline. The criteria which are used by the Division Committee to evaluate a candidate are developed by the respective departments and approved by the UMBC Senate. In general, the criteria cover (1) teaching, (2) scholarship, and (3) service to the Department.

The criteria developed by the Department of History at UMBC to be utilized in promotion and tenure decisions are contained in a document entitled "Criteria for the Evaluation of UMBC History Faculty" (DX 14). In reference to the area of *teaching,* that document states that the major judgment on the quality of teaching will be made by a Committee of the Department of History which involves a peer teaching evaluation of each candidate by other faculty members in the Department. As to the area of *service,* the document states that every member of the history faculty ". . . is expected to share the administrative responsibilities of the Department, the Division, and the University." As to the area of *scholarship,* the document states "Attention should be given to the originality and soundness of the study, the value of a work which synthesizes various scholarly efforts in a particular historical field, or the level of competence and scope of effort demonstrated by the editing of historical materials."

Once a promotion and tenure committee has completed its review, it sends its report to the Dean of the Division who sends a copy of the report, along with his own recommendations to the candidate who may comment upon them. The Dean then transmits the report, his recommendations, and the candidate's response to the Vice Chancellor, who was during the relevant period Dr. Baratz. If the candidate is of the opinion that the Review Committee's decision not to retain or promote was unjust, the candidate may appeal the decision through detailed procedures for appeal which are set forth in DX 190. The only significant changes in the promotion and tenure policies which occurred during the time relevant to this suit were in the procedures for appeal by a candidate. The appeals process listed in the "Promotion and Tenure Policies" document (DX 190) was replaced by the Faculty Senate in February, 1974. The new procedure is described more fully in the UMBC Faculty Handbook published in July, 1975 (DX 197). At UMBC, the standard appointment to Assistant Professor is a three-year initial appointment. In the probationary first year, a formal review is made. In the second year a review is made to determine whether a renewal of the contract will be offered. A standard renewal of a contract is for three additional years with a review in the fifth year for the tenure decision. Normally, individuals who have not completed the PhD degree are hired as Instructors and promoted to Assistant Professor on the receipt of the degree. Subsequent promotion, if at all, is to the Associate Professor rank and then to the full Professor rank.

With the foregoing background, it is appropriate to examine the facts concerning the relationship of Dr. Bettye Thomas with UMBC. In the spring of 1971, Bettye Thomas, who is black, was interviewed by the History Department faculty at UMBC. At that time she did not have the PhD degree. After her interview the History

Department, through Dr. George A. Klein, Jr., then Coordinator of the History Department, recommended to Dr. Charles F. Peake, then Acting Chairman of the Division of Social Sciences, that Bettye Thomas be employed by UMBC in the Department of History. Although an individual without the PhD degree would normally be hired as an Instructor, Dr. Klein suggested to Dr. Peake that Bettye Thomas might not accept an instructorship since her curriculum vitae listed her as an Associate Professor of Washington Technical Institute and at William and Mary College. There was a precedent for hiring persons without a PhD at the rank of Lecturer in order to pay salaries higher than those associated with the rank of Instructor. It was generally assumed by the members of the History Department that the initial appointment for Bettye Thomas would be as Instructor or Lecturer and that upon completion of the PhD degree she would be appointed as an Assistant Professor as was the customary procedure with all persons possessing similar credentials. At the time Bettye Thomas was hired, three other faculty members, all white, were also hired in the History Department. Two had the PhD degree and were hired at the rank of Assistant Professor. One who did not have the PhD degree was hired as an Instructor and promised promotion to the rank of Assistant Professor upon receipt of it.

Negotiations with respect to the hiring of Bettye Thomas were conducted by Dr. Peake who, at that time, was an Assistant Professor in Economics and had only held the PhD degree himself for about three years. He was inexperienced in matters of academic administration. Dr. Peake drafted a letter of appointment stating that Bettye Thomas would receive a salary of $15,-000, would hold the rank of Lecturer, and, upon completion of the PhD degree, by August 31, 1972, would be recommended for appointment as an Associate Professor. Upon reviewing the drafted letter, Dr. Ho-

mer W. Schamp, then Vice Chancellor for Academic Affairs, included the words "on the recommendation of the History Faculty" to that portion of the letter referring to the Associate Professor rank. Dr. Thomas was notified on May 18, 1971, by letter that she would be recommended for appointment as a "Lecturer in History for the academic year beginning September 1, 1971, at a salary of $15,000." That letter carried the following proviso:

> "It is understood that if you complete all requirements for the PhD degree by August 31, 1972, you would, on the recommendation of the History Faculty, be offered a position as Associate Professor of History for the academic year beginning September 1, 1972. An appointment as an Associate Professor would be for an initial period of two years and you would be evaluated for permanent tenure during the first year of appointment."

After Bettye Thomas indicated that she would be willing to accept the conditions, Dr. Schamp formally recommended to the Chancellor of the Baltimore County Campus, then Dr. Albin O. Kuhn, by letter dated June 10, 1971, that the appointment be made on the conditions earlier stated, which recommendation was approved.

Although it was the customary practice for the faculty of the History Department to participate in the decision as to the rank to be offered to a potential appointee, Dr. Peake departed from this procedure in his recommendation of the appointment of Dr. Thomas and failed to consult with the History Department faculty as to the rank to be offered her upon completion of her doctorate. Dr. Klein did not learn of the terms of the offer to Bettye Thomas until after negotiations between Dr. Peake and Bettye Thomas had been completed.

No person at UMBC other than Bettye Thomas [2] was ever appointed on the condition that upon completion of PhD requirements, the appointee would be recom-

2. There is some confusion, as a result of an ambiguity in the original appointment, whether Bettye Thomas was promised the rank of Associate Professor upon completion of her degree or whether she would be given the rank of Associate Professor upon the completion of her degree by August 31, 1972, if recommended for it by the History Department.

mended for appointment as an Associate Professor. The court finds that such an offer would be highly unusual at most, if not all, reputable universities. Individuals at UMBC have held the rank of Associate Professor or full Professor without having a PhD degree, but in every such case, either the individual has had an equivalent foreign doctorate or the terminal degree which existed in the pertinent field at the time that the individual was a degree candidate or the individual was a performing (music, theatre, film) or creative (poetry, creative writing) artist. No person in the History Department or in the Division of Social Sciences at UMBC has ever been employed at the rank of Associate Professor or full Professor who did not have the PhD degree.

At institutions of higher learning generally, and at UMBC in particular, there are only four academic ranks, being in order, Instructor, Assistant Professor, Associate Professor, and full Professor. In the absence of highly unusual circumstances, universities in general and UMBC in particular do not allow a person to skip ranks above the lowest rank. To do so would create many morale and other problems in the university setting, particularly if the person who is allowed to skip rank is not unusually distinguished and recognized in his or her field. Universities generally require that a faculty member possess the PhD degree for a significant period of time before promotion to a rank above Assistant Professor in order to ensure that the individual can perform on his or her own, outside the "pupil-mentor" setting of a graduate program leading to a PhD degree.

The salary at which Bettye Thomas was hired to commence teaching in the fall semester of 1971 was the second highest salary of the active members of the History Department, the highest salary being paid to another black person, who was a full Professor (Faculty Member A9). Bettye Thomas, as a Lecturer, was paid more than any of the ten Assistant Professors in the History Department and more than the only active Associate Professor, Dr. Papadakis, who was at that time the Department Chairman.

Near the end of the first semester of the 1971–72 academic year, rumors began to spread within the History Department concerning the terms and conditions of the contract of Bettye Thomas. An unfortunate meeting of the Department took place on February 10, 1972, at which the faculty discontent relative to the unusual terms and conditions of the appointment of Bettye Thomas was vented. The meeting was held in order to dispel the rumors about the terms and conditions of her appointment and to clarify the role of the Department in view of the specific phrase "upon the recommendation of the History Department" which appeared in the appointment offer. It was feared by some members of the Department that the probationary year review which Bettye Thomas was to undergo would be construed as automatic approval by the Department of later promotion to the rank of Associate Professor. The matter was resolved when Dean Graham, who did not attend the February 10 meeting, informed the Department that the Department would have a say in the rank to be offered Bettye Thomas if and when she completed the PhD degree and that her rank as Lecturer and her salary would remain as originally offered to her.

At the time that she was hired, Bettye Thomas was advised that the first year of her appointment as a Lecturer would be probationary and that unless notified by March 15, 1972, that she had not successfully completed the probationary period, the appointment would be continued for the 1972–73 academic year. In accordance with the requirement for such a review, the History Department Faculty Evaluation Committee indicated on February 15, 1972, that it was "in general satisfied with Mrs. B. Thomas' performance during her probationary period and recommends that her appointment be continued for 1972–73 academic year." That recommendation was concurred in by the Divisional Promotion and Tenure Committee for History on March 2, 1972.

In accordance with written History Department regulations in effect prior to the

time that Bettye Thomas arrived on the campus, a Departmental Teaching Evaluation Committee for American Historians was convened in the spring of 1972 to evaluate not only Bettye Thomas but also faculty member A and faculty member B who were also in their second semester of employment in the History Department at UMBC. In the fall of 1971, faculty member G and faculty member K had also been evaluated according to the procedures which had previously been established. The Committee was chosen by lot at a Departmental Meeting on January 4, 1972, and consisted of Drs. Arnold, Low, and Mohr (Chairman). Dr. Low requested of the Chairman to be excused from serving on the Committee due to other commitments which he had on his time, and he was replaced by Dr. William Becker, whose name was also chosen by lot by Dr. Mohr in the presence of Dr. Papadakis, then Chairman of the Department, Dr. Ailene Austin, and others. The History Department's plan of organization required that the Evaluation Committee must consist of professors equal to or higher than the highest rank of the persons to be evaluated. Since one of the three evaluees held the rank of Assistant Professor, the only available names left for drawing by lot were Drs. Becker and Austin (the only other professors in American History with the rank of Assistant Professor or higher).

In accordance with the written procedures of the History Department, the Departmental Teaching Evaluation Committee and the three evaluees agreed upon evaluation procedures. The Committee visited each evaluee's classes and submitted to the evaluees preliminary reports which were meant to be working papers and were not put in their personnel files (DX 33). The evaluations as to each evaluee were written individually by each member of the Committee and were not discussed among them prior to submission to the respective evaluees. After receipt of her evaluations, Bettye Thomas refused to meet with the Teaching Evaluation Committee to discuss them because she felt the Committee was hostile to her. The Committee, by a memo-randum dated May 24, 1972, informed Bettye Thomas that she should not take "the three analyses so personally" and went on to state as follows:

"The May 24 meeting was originally designed as an opportunity to discuss with the Committee precisely those instances in which evaluees felt that Committee members' individual first impressions were erroneous . . .. 'We intended, as you may recall from History Department meetings, that these evaluations be looked upon as a way of improving the quality of teaching and protecting teachers from biased student evaluations. The preliminary evaluations which you received on Monday were not for your permanent file. They are working papers. Only a final report would normally have gone beyond this committee.'"

No final report was ever drafted for Bettye Thomas because she never completed the prescribed evaluation nor did she ever undergo and complete a teaching evaluation as required by the Departmental Plan of Organization. No other history faculty member required to have a peer teaching evaluation under the Plan of Organization has refused to undergo and complete such an evaluation. At least 14 other members of the History Department have completed the peer teaching evaluation program.

The History Department Plan of Organization provides that a faculty member who is dissatisfied with the evaluation procedures or their implementation may request another committee be appointed or may appeal to the Faculty Council of the History Department. Bettye Thomas was aware of the Plan of Organization as early as December 6, 1971, as well as prior to her evaluation in the spring of 1972. She did not follow the procedures of the History Department but rather immediately took her complaint to Dean Graham, and to the representative of the American Association of University Professors.

Dr. Levine, who was Chairman of the History Department in the academic year of 1973–74, in the fall of 1973, with the

encouragement of Dean Graham, urged Bettye Thomas to take advantage of the provision of the History Department Constitution which gave an evaluee the right to protest the composition of a peer evaluation committee and to have that committee reconstituted. He then urged her to complete the peer teaching evaluation procedure. She was subsequently urged by Dr. Arnold to complete the procedure. Although the faculty was notified at the beginning of each year that it could request a peer teaching evaluation, Bettye Thomas never did so.

When Bettye Thomas failed to complete her PhD degree requirements by August 31, 1972, the date stipulated in her original contract, Dean Graham inquired about the University's obligations under that contract. Advice was sought by him from Dr. Baratz, who in turn referred the matter to Dr. R. Lee Hornbake, the Vice President of the University for Academic Affairs. Dr. Hornbake referred the matter to the office of the Attorney General of Maryland in order that the University could be advised of its legal obligation in this regard.

Assistant Attorney General Fishbein advised that, as a matter of contract law, Bettye Thomas need not be considered for appointment to the rank of Associate Professor upon subsequent completion of the PhD degree since she had failed to complete the degree requirements by August 31, 1972. Assistant Attorney General Fishbein also expressed concern that the original offer had been made without regard for the conditions which she understood the University had postulated for the rank of Associate Professor and that the renewal of the original contract terms might have adverse impact upon litigation then pending against the University of Maryland in the federal courts.

Upon receipt of the Opinion of the Attorney General's office, Vice Chancellor Baratz, who had close to 30 years' experience in higher education, did not think that Bettye Thomas was qualified for the rank of Associate Professor upon receipt of the PhD degree. He had examined her credentials as well as those of every member of the

History Department and the Social Sciences Division at some point during his term as vice Chancellor. He recommended that the original offer not be renewed but that Bettye Thomas be promised the rank of Assistant Professor upon completion of her PhD degree. UMBC Chancellor Lee, taking account of the legal advice which had been received, and his own independent academic judgment that the original contract terms were not in accordance with University policy and his attempt to upgrade the academic standing of the University, as well as his belief that the previous offer had been made in error and should not be perpetuated, decided in the fall of 1972 to grant to Bettye Thomas an extension of time within which to complete the requirements for the PhD degree coupled with an offer of promotion to Assistant Professor rank upon the completion of said degree.

Bettye Thomas was advised by letter, dated November 29, 1972, that the portion of Dr. Peake's letter of appointment concerning academic rank was no longer applicable, but that her then present status as Lecturer and her salary would remain the same. She was also advised that a recommendation was being made that the deadline for completion of all requirements be extended to September 1, 1973, and that should she complete her PhD requirements by that time, she would be recommended for appointment as of that date to the rank of Assistant Professor. The offer contained in Dr. Lee's letter was consistent with then prevailing University policy and with the treatment accorded to persons similarly situated regardless of race who had been hired by UMBC before completing all of the requirements for the PhD degree.

By memorandum dated March 19, 1973, Bettye Thomas was advised of a further extension for the completion date until February 1, 1974, and that, should she not complete the degree by that date, the academic year 1973–74 would be terminal in her case and in the case of other members of the faculty in the Division of Social Sciences. The extension to February 1, 1974, with its provision for immediate pro-

motion, was favorable to Bettye Thomas since, under customary procedures, the faculty at UMBC who completed the PhD degree before October 31 were promoted to Assistant Professor retroactively to the beginning of that academic year, but the pay for that rank was effective only from the date that the degree was completed. The customary procedure at UMBC was that those who completed their degree at a date subsequent to October 31 during any given academic year were required to await the beginning of the next academic year for both promotion and the salary increment.

When Bettye Thomas completed all the requirements for the PhD degree at the end of 1973, she was appointed Assistant Professor of History at the salary of $16,400. The contract awarded to her was the standard form agreement used for all faculty. It provided for appointment to the rank of Assistant Professor for an initial term. The first year of the initial three-year term was to be a probationary year, automatically renewable for an additional three-year term if she were not notified at least by June 30, 1975, of the intention of UMBC not to renew (DX 96).

Bettye Thomas received the appointment retroactively to September 1, 1973. She also received the salary increment effective September 1, 1973, due to an administrative error, but the University made no effort to recover the salary erroneously paid prior to the date when Dr. Thomas acquired her PhD.

In the academic year 1973–74, Dr. Thomas, as Assistant Professor, was paid the third highest salary of the active members of the Department. The highest salary was paid to another black person, who was a full Professor (Faculty Member A9). The second highest salary was paid to an Associate Professor, Dr. Norman Levine, who was then Chairman of the Department. An Associate Professor (Faculty Member D) was paid the same salary as was Dr. Thomas. She was paid more than any of the 13 other Assistant Professors in the Department and more than three of the Associate Professors. The average salary of the other 13

Assistant Professors of History was $11,653 for that academic year.

In the spring of 1974, Bettye Thomas and other faculty members in the first year of appointment as Assistant Professors were reviewed with respect to the question of whether they had successfully completed the probationary year of their three-year contracts. All faculty members of the Social Sciences Division were aware that the standards utilized in a probationary review are far less rigorous than a review for contract renewal or for promotion and tenure (euphemistically termed "P and T"). In a memorandum to the faculty dated February 11, 1972, Dr. Graham, in reviewing the entire P and T Process stated in part as follows:

"In conclusion, of the 22 faculty members of this Division scheduled for review this spring, almost half are up for review because they are in their first or probationary year. While outside this Division such reviews have occasionally been handled administratively rather than by P and T Committees, I prefer that such persons should receive a full Committee review of strengths and weaknesses since probationary year reviews are rarely threatening and should constitute a helpful assessment for first year faculty of Assistant or Associate Professor rank."

(DX 20).

The members of the History Faculty who were on the Divisional P and T Committee at that time were Drs. Arnold, Becker, and Low. Dr. Thomas was notified by letter of March 20, 1974, of the successful completion of her probationary year.

The report of the Divisional P and T Committee for History, relative to Dr. Thomas, did not mention the 1973 peer preliminary evaluation because the members of the History Faculty on the Committee (Drs. Arnold, Becker, and Low) felt that it would be better to discuss the matter with her personally in view of her previous reaction to criticism and in an effort to heal the problems which Dr. Thomas perceived existed between her and the members of the Department. Dr. Becker, the person Dr.

Thomas alleged was most hostile to her of all of the Faculty Members, was the individual who wrote the favorable probationary evaluation. In accordance with the discussions between the History Faculty Members of the Divisional P and T Committee, Dr. Arnold, who had spoken to Dr. Thomas previously on several past occasions about the desirability of her completing the peer evaluation procedure, agreed to speak to her again. Within a week or two of March 20, 1974, Dr. Arnold spoke to Bettye Thomas privately and urged her to undergo and complete the departmental requirement of the peer teaching evaluation, advising her that a new Committee could be formed if she desired. He also advised her that her service to the History Department was deficient in that she should become a more active member of the Department. During that conversation, Dr. Thomas told Dr. Arnold that she believed that she had been racially discriminated against when she had not been given the rank of Associate Professor and that she expected to take some action in reference to it. Dr. Arnold, who up to that time was unaware of any intent on the part of Dr. Thomas to claim racial discrimination, told Dr. Thomas that he did not believe that racial discrimination played any part in the action of the University in her case and that her future at UMBC would be better served by her cooperation with the members of the Department in becoming a more active member thereof and in completing the peer evaluation process.

Several days later the complaint was filed by the NAACP with the EEOC on behalf of Dr. Thomas.

In accordance with the requirement of her contract that she be reviewed on the question of contract renewal and notified before June 30, 1975, Dr. Thomas was included as a candidate for review by a History Departmental P and T Committee in the spring of 1975. She was one of several members of the Department who were up for review that spring.

The Departmental P and T Committee which reviewed Dr. Thomas also reviewed all other History Faculty who were similarly situated to her as to rank and date of employment. In accord with the rules of the Department, all members of the Department who were senior in rank to Dr. Thomas composed the Departmental P and T Committee with the exception of Dr. Low. Although Dr. Low, a full Professor and a black man, was asked by Dr. Mohr, the Chairman of the Department, to serve, Dr. Low did not serve on any P and T Committee that spring at his request due to other commitments or workload.

Dr. Storch, one of the founders of the History Department at UMBC, transferred to the Department of Ancient Studies from the History Department in 1971. In 1971, however, he was voted unanimously by the History Department to have full rights and privileges of a member of the History Department (DX 305A). Dr. Storch was often called upon to sit on Promotion and Tenure Committees because of the scarcity of tenured Associate Professors in the Department. In 1975, Dr. Thomas never raised the issue that her Departmental Review Committee was not duly constituted to review her since she assumed, as everyone else in the Department did at that time, that Dr. Storch was a member of the Department with all rights and privileges of a member. Nothing in the record indicates that anyone sought out Dr. Storch to sit exclusively on the P and T Committee of Dr. Thomas or that Dr. Storch did not serve later on other P and T Committees.

In a report dated March 4, 1975, the History Departmental P and T Committee recommended by a vote of three in favor and three opposed that the contract of Dr. Thomas not be renewed. The Committee rejected offering Dr. Thomas a one-year extension by a vote of four to two and a two-year extension by a vote of five to one. The report noted her refusal to participate in the mandatory peer evaluation procedure as required by the History Department rules and it also cited her lack of service to the History Department. The persons who served on the Departmental P and T Committee were Dr. Arnold, Dr. Becker, Dr.

Papadakis, Dr. Storch, Dr. Levine, and Dr. Mohr. Drs. Arnold and Papadakis had voted for a one-year contract renewal, Dr. Levine for a two-year contract renewal, and Drs. Mohr, Becker, and Storch for termination.

Dr. Levine prepared a minority report (DX 85) which he appended to the Departmental P and T Committee Report. In it, he stated that "Dr. Thomas's performance in the areas of scholarship, teaching and service are sufficient for a two-year renewal of contract." He disputed certain points in the majority report and criticized what he believed to be a failure to give Dr. Thomas prior notice of certain of her alleged inadequacies. He stated in part as follows:

". . . Other cases before this Committee involved three-year renewals. This Report and Recommendation on Dr. Thomas is for a two-year renewal and thus explicitly recognizes the difference in the performance of her professional duties to the others involved.

\* \* \* \* \* \*

"Professionally Dr. Thomas's service performance has been inadequate. She has not been a fully participating member of the Department. She is frequently absent from Department meetings. She is frequently absent during periods of recruitment. She shows little interest in acquainting herself with the important affairs of the Department and in contributing to their constructive resolutions. It is often times difficult to reach her. These breaches of professionalism are of the utmost seriousness and cannot be minimized.

\* \* \* \* \* \*

"This is one of the reasons this Report recommends a two-year instead of a three-year renewal of contract. Constitutionally, Dr. Thomas has served Department, University, and Community, and thus there are no grounds for a nonrenewal of contract. But professionally, her service area is inadequate and by the granting of a two-year contract to Dr. Thomas, she is being clearly asked to improve her service component. This stand is also clearly nonprejudicial to the other members of the Department who have come up this year for contract renewal. Because their performance has been both constitutionally and professionally adequate and they have been given three-year renewals and been commended for their activities. Because of Dr. Thomas's deficiency in her professional service area (as well as other problems—see below) she is only being recommended for a two-year renewal in this Report, and admonished so that her performance must improve to meet the professional standards of the Department and the University.

\* \* \* \* \* \*

"Regardless of the legal aspect, this Report does not feel that the breakdown of one-third of the [peer] evaluation process is grounds in itself for nonrenewal. All the other information, two-thirds of it, points to the fact that she is a good teacher. Based on her enrollments, there is no doubt she is a popular teacher. It is hoped that the visitation process will be completed justly and equitably.

"Nevertheless, procedures must be upheld. This Report points out to Dr. Thomas categorically that it is Department regulations that retention, promotion and tenure are finally dependent upon completing this process in full. The procedures of the Department must be applied equally to everyone. There can be no exception to this rule. With this categorical understanding that no one can suspend these rules arbitrarily, this Report warmly encourages Dr. Thomas to reopen the visitation process. There is good sense, fairness and equity on all sides of this issue and we take this opportunity to invite Dr. Thomas to work with us in a just resolution of this issue for the benefit of all concerned."

(DX 85).

Dean Graham appointed the members of the Divisional P and T Committee for History. The members of the Divisional Com-

mittee from the History Department were Drs. Becker, Mohr, and Papadakis. This Committee reviewed not only Dr. Thomas, but all other members of the History Department of the same rank and length of service as Dr. Thomas.

In a memorandum dated March 10, 1975, supported by the Dean of the Division of Social Sciences, the Divisional Promotion and Tenure Committee for History recommended that the contract for Dr. Thomas not· be renewed by a vote of five in favor, one opposed, and one abstention. The Committee rejected a one-year extension of her contract by a vote of five to one, with one abstention, and two or three-year extensions by a vote of six to zero, with one abstention. The Report of the Committee gave a positive view of the scholarship of Dr. Thomas based on the entries in her curriculum vitae. It stated that the Committee could not endorse her teaching, however, because of her refusal to cooperate in the peer evaluation process which was the major instrument in the Department for evaluating teaching. It also stated that she had not fulfilled "the professional duties required of all Department members" (PX 86).

After Dr. Thomas had sent to Dean Graham a persuasive reply to the Departmental and Divisional P and T Committee Reports for forwarding to the administration, Vice Chancellor Baratz hand delivered to Chancellor Lee his recommendation that the negative report of the Committees and the Dean's recommendation be overturned. Prior to that time, the administration had never overturned a negative report of the P and T Committees relating to contract renewal. Dr. Lee, after talking with Dr. Baratz, suggested that the Divisional Committee should provide further substantiation for its report.

On at least 10 other occasions, nine of which involved white faculty and one of which involved a faculty member of oriental descent, Vice Chancellor Baratz had sought such amplification of P and T Committee Reports. In a memorandum of March 20, 1975, which was received by Dr.

Graham on March 21, 1975, Dr. Baratz requested clarification and amplification of the Divisional P and T Committee's Report in the area of teaching, scholarship, and service to the Department.

In order that the Divisional P and T Committee could amplify its report in the area of scholarship, it requested a copy of the publications of Bettye Thomas and other evidence of scholarship, including published work, unpublished papers, dissertation, and the manuscript which had been accepted as suitable for eventual publication by the University of Illinois Press. Dr. Thomas had not submitted such material earlier in response to the initial departmental request that all candidates for review furnish such material. Contrary to the subsequent request, Dr. Thomas submitted only three articles and a single chapter from her dissertation.

On April 2, 1975, Dr. Thomas wrote Dr. Baratz and requested review of her scholarship by historians not connected with UMBC. Dr. Baratz forwarded that request to Dean Graham. Dean Graham, in conjunction with the Divisional P and T Committee, determined not to have such an outside review of scholarship for the following reasons: (1) it was not the practice at UMBC to have outside review of scholarship in cases in which the only question was contract renewal as opposed to a decision on tenure or promotion; (2) the scholarship of Dr. Thomas was not the primary concern of the Committee and, in fact, her scholarship had been endorsed in the original report; (3) there were members on the P and T Committee expert in American History, Urban History, and Economic History capable of evaluating her scholarship; and (4) it was questionable whether an outside review of scholarship could be completed within the time framework required to ensure that the date for contract renewal notification was met.

On May 16, 1975, the Divisional P and T Committee for History submitted an amplified report. The Committee reiterated its inability to endorse Dr. Thomas in the area of teaching, and noted in particular her

refusal to participate in a peer evaluation that had been "submitted to by every other new member of the UMBC History Faculty for the last five years. . . ." In commenting upon the materials that Dr. Thomas had made available to the Committee, it found that "her work is descriptive and narrative, rather than theoretical or interpretive . . .. [S]he leaves to others to discuss the relationship of her findings to more general interpretation of the black experience." The Committee also referred to the lack of required service to the Department by Dr. Thomas, particularly in the area of recruitment. Accordingly, it reaffirmed its original recommendation that her contract not be renewed by the same votes.

As a part of the amplified report, the P and T Committee referred to an incident of alleged unprofessional behavior in which Dr. Thomas, while interviewing for a position on the College Park Campus of the University of Maryland, accused the members of the History Department at UMBC of being racists.

Dean Graham endorsed the amplified report of the Divisional P and T Committee for History and, in the same memorandum to Dr. Baratz, raised an issue of the alleged misrepresentation by Dr. Thomas of her credentials at the time she was originally employed at UMBC. Dr. Graham had understood from Dr. Peake and others that the original contract offer to Bettye Thomas had been made on the basis of the credentials which she had at that time in 1971.

The curriculum vitae upon which a decision was made to invite Mrs. Thomas to the UMBC Campus in 1971 for her initial interview with Dr. Peake had stated in error that she had been a part-time Adjunct Professor at William and Mary College at the rank of Associate Professor and that she had also held the position of Associate Professor at Washington Technical Institute. In fact, she had been a part-time Instructor in an extension course in Fairfax County, Virginia, sponsored by William and Mary College, and had been negotiating with Washington Technical Institute for a full-time position as an Associate Professor but

had actually been teaching on a part-time basis at the Washington Technical Institute, a two-year college, at the rank of Assistant Professor. At the interview held initially with Dr. Peake in 1971, Bettye Thomas had told him that she had been a part-time Adjunct Professor at the Associate Professor rank level at William and Mary College and that she had been an Assistant Professor at Washington Technical Institute but had been negotiating for full-time employment at that institution at the Associate Professor rank. Her initial curriculum vitae was not corrected but remained in her file as originally submitted.

Dr. Graham was requested to comment on a letter which Dr. Peake had written in March of 1974 to Clarence Mitchell, an official of the NAACP, concerning the refusal of UMBC to promote Dr. Thomas to the rank of Associate Professor. In that memorandum (DX 100), Dr. Graham asserted that the ". . . claim that the Associate offer [to Dr. Thomas] was equitable when compared to others at UMBC is nonsense." In that memorandum he noted that at the time Bettye Thomas was being hired, two teachers, Drs. Levine and Arnold, were rejected for promotion to the Associate rank even though they were many years past their PhDs and had considerable publications to their credit. In reference to Dr. Thomas, he stated, in addition:

"Her two previous appointments with the title of Associate were *not* remotely equivalent to Associate rank here, which when it comes through promotion involves permanent tenure; one of those appointments involved teaching one course in Black History, one time only, at William and Mary; the other involved some teaching at a place called the Washington Technical Institute, whatever that is, while she was teaching at Howard."

(Emphasis in original). In connection with the claim of discrimination which was filed with the EEOC on behalf of Dr. Thomas, Dr. Graham, at the request of the office of the Attorney General, contacted the Washington Technical Institute in the fall of 1974 and learned that Bettye Thomas had

the rank of Assistant Professor, not Associate Professor, when she was at the Washington Technical Institute. On the advice of the Attorney General's office he had not discussed his finding with Dr. Thomas. Early in February, 1975, in response to the direction to all faculty members who were up for review to update their dossiers, Dr. Thomas had submitted a revised curriculum vitae which retained the Associate rank at William and Mary but changed the Washington Technical Institute employment to the rank of Assistant Professor. Actually, unknown to Dr. Graham, Dr. Thomas had listed that same position as "Assistant" in her faculty information sheet on August 12, 1971, and in a curriculum vitae submitted for her UMBC personnel file in 1972 (PX 12, 14). Dr. Graham wrote to Dr. Thomas on February 27, and again on March 12, 1975, requesting an explanation of the discrepancy but received no reply. In the meantime, Dr. Graham communicated with William and Mary's School of Education and learned that Bettye Thomas had been appointed as an Instructor in the Extension Division and had no rank as an Associate Professor there. Dr. Graham, in his memorandum to Vice Chancellor Baratz attaching the amplified P and T Committee Report, outlined the above facts and stated:

"So, *in the absence of evidence to the contrary,* I can only conclude that Mrs. Thomas consciously misrepresented her previous conditions of employment in an effort to achieve Associate rank at UMBC."

(Emphasis supplied) (PX 99). A copy of that memorandum was sent to Dr. Thomas under date of May 19, 1975, and she was invited to respond.

The issue of misrepresentation of credentials was not raised with the Promotion and Tenure Committee on the advice of the office of the Attorney General. As Chairman of the Department, Dr. Mohr had been told confidentially and with specific admonition that he not tell anyone else. The Chairman of the Divisional Promotion and Tenure Committee for History, Dr. Becker, was told in order that the misrepresentation issue would not be brought before the Committee in its deliberations. The Committee did not discuss the issue.

By memorandum dated May 21, 1975, Vice Chancellor Baratz concurred in the recommendation that the contract of Bettye Thomas not be renewed. In his memorandum to Chancellor Lee, he stated that Dr. Thomas had told him that she "couldn't and wouldn't respond" to the Report "for at least three weeks" and suggested to Dr. Lee that he might want to delay a final decision until a written response from Bettye Thomas was received.

On June 10, 1975, in a letter to Dr. Baratz, Dr. Thomas provided her explanation of the discrepancies which existed on her curriculum vitae and described the representations made concerning her employment. Dr. Baratz found her explanation a "convincing rebuttal" (which he explained at trial meant "plausible") and so advised Dr. Lee. Dr. Baratz testified that the issue of the misrepresentation of her credentials played no role in his recommendation not to renew her contract and the court so finds.

Chancellor Lee approved Dr. Baratz's recommendation and reasoning in a memorandum on June 17, 1975, signing and dating it on the bottom (PX 166). Dr. Lee testified that the misrepresentation issue played no part in his decision and the court so finds. This decision to terminate Bettye Thomas, however, never became operative because of continuing discussions with the United States Department of Justice concerning the EEOC complaint which had been filed on behalf of Bettye Thomas. During this time the United States Department of Justice had under advisement the charge of race discrimination and the decision of the EEOC. Pursuant to agreement between the University and the Justice Department, with the concurrence of Dr. Thomas, no final decision was made on her contract renewal until September 30, 1975. As late as mid-September, 1975, it was the intention of Chancellor Lee to endorse the recommendations for nonrenewal of the contract of Dr. Thomas. However, in view of the Justice Department's position, which

suggested that suit would be brought on behalf of Dr. Thomas, Chancellor Lee made an unusual decision and determined, as reflected in his letters dated September 30, 1975, and October 2, 1975 (PX 109, 110), to offer continued employment to Dr. Thomas. This constituted the only time that he ever overruled a negative recommendation of a P and T Committee. He offered a new one-year contract with the possibility for renewal and subsequent promotion to the rank of Associate Professor. This offer did not single out Bettye Thomas because of her race or in retaliation for having filed a Title VII complaint. In fact, the offering of new contracts for periods of less than three years to persons at the Assistant Professor rank, while never before having been offered by the Chancellor after the completion of the first three-year contract, had previously been offered in cases involving white males as a result of the recommendation of the P and T Committee. The conditions placed in the proposed one-year contract were not unusual or extraordinary and merely required that she do what every other member of the Department of History was required to do, that is, among other things, abide by the procedures for review of faculty members set forth in the Plan of Organization of the Department of History at UMBC and in the UMBC Faculty Handbook.

The decision of Chancellor Lee to offer a one-year renewal to Dr. Thomas was an attempt to settle all pending disputes. His decision was not in retaliation for the filing of a charge on behalf of Bettye Thomas with the EEOC.

Dr. Thomas rejected the offer and her contract expired by its terms on June 30, 1976.

### Discussion

#### A. The Discrimination Charge

■ In order to prevail on the discrimination claim, plaintiff has the burden of first establishing a *prima facie* case of race discrimination under Title VII. Then, if defendants can show legitimate nondiscriminatory reasons for their actions, plaintiff has the opportunity of showing that the defendants' stated reasons were in fact just a pretext. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). One of the essential elements of a *prima facie* case is that the complaining employee be qualified for the position at issue. *Id.; Griggs v. Duke Power Co.,* 401 U.S. 424, 430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The most practical way for plaintiff to establish that Dr. Thomas was qualified for the Associate Professor rank in the History Department at UMBC in early 1974, when she completed all the requirements for her PhD degree, would be to compare her credentials with the credentials of others in the Department promoted to Associate Professor at or about that time. Plaintiff has not produced any evidence, however, that anyone in the Department was promoted to Associate Professor upon the receipt of a PhD degree. Neither has plaintiff attempted to compare the qualitative credentials of Dr. Thomas with others in the Department who were promoted. This court has found as a fact that, in institutions of higher learning of more than minimal academic stature, persons are not appointed to the rank of Associate Professor upon receipt of the PhD in the absence of highly unusual circumstances none of which apply in the case of Dr. Thomas.

■ Professional judgment necessarily is of great importance in decisions relating to promotions in academia. *Faro v. New York University,* 502 F.2d 1229, 1231–32 (2nd Cir. 1974); *EEOC v. Tufts Institution of Learning,* 421 F.Supp. 152, 158 (D.Mass.1975); *Peters v. Middlebury College,* 409 F.Supp. 857, 868 (D.Vt.1976). The courts are reluctant, and properly so, to substitute their judgment for the judgment of professional academics with expertise in their respective fields. *Green v. Board of Regents of Texas Tech University,* 335 F.Supp. 249, 250 (N.D. Tex.1971), aff'd 474 F.2d 594 (5th Cir. 1973).

■ The plaintiff noted that the representation of blacks on the UMBC faculty has steadily declined since 1971–72 and argued that "only one of 91 faculty members

presently employed at UMBC's Social Sciences Division is black," concluding that "these facts support the United States' claim that race was behind the failure to promote Dr. Thomas to Associate Professor" and that "the fact of minority underrepresentation at UMBC and on the Social Sciences Division faculty in particular remains otherwise unexplained by defendants." The "facts" relied upon in this context by the plaintiff are of minimal, if any, probative value in determining whether or not racial discrimination exists. Statistics are a recognized source of proof in employment discrimination cases, but the plaintiff has not developed factually the basis for utilization of statistical evidence in this case. In order to utilize statistics to support the plaintiff's case, the plaintiff had the burden of proving the available levels of black faculty qualified to teach at UMBC in order to compare such percentage levels with the percentage of black faculty actually employed at UMBC. In the absence of evidence of the appropriate comparative figures, the statistics pointed out by the plaintiff are meaningless. *Hazelwood School District v. United States,* —— U.S. ——, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

■ In any event, it was shown in this case that the United States Department of Health, Education & Welfare agreed to accept the figure of "less than 1%" as indicative of the availability of blacks with PhD degrees in 1973 (PX 126). Plaintiff has not shown that figure to be erroneous or that it has changed since that time. The plaintiff's assertion that there is an underrepresentation of black faculty at UMBC or in the Social Sciences Division is an unsupported assumption.

■ Even if the plaintiff had established a *prima facie* case of racial discrimination in the denial of promotion to the rank of Associate Professor, the defendants produc-ed persuasive legitimate and nondiscriminatory reasons for their action in refusing to promote her to Associate, rather than Assistant, rank. The original offer was unprecedented. As a matter of contract law, the University was not bound to continue the offer. The offer had already created morale problems within the History Department and would have intensified those problems if implemented, particularly in the absence of a contractual obligation so to do. The promotion of Dr. Thomas to Associate rank could potentially have opened the University to liability in suits by other faculty members who might claim that unequal standards were being applied.[3] UMBC, from 1971 on when Dr. Lee became Chancellor, was attempting to upgrade its academic standards, and Dr. Lee did not believe that the award to Dr. Thomas of an Associate rank would advance UMBC's academic progress, but would, in fact, hinder it.

While plaintiff has argued that circumstantial evidence justifies the inference that the reasons given by the defendants for the nonpromotion to Associate rank of Dr. Thomas were a pretext and that, in fact, the action was racially motivated, this court is not persuaded. The evidence discloses that Dr. Lee personally made the decision that the original contract offer to Bettye Thomas was a mistake, should not have been made, and should not be perpetuated. No evidence suggests that Dr. Lee was racially biased.

### B. The Retaliation Charge

The Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a), provides in pertinent part:

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practices

---

**3.** That the fears in this regard of the Maryland Attorney General's Office and of UMBC's Administration were not unfounded was emphasized by recent decisions of the Supreme Court interpreting the goal of Title VII to be elimination of discrimination in employment ". . . regardless of whether the discrimination is di-rected against majorities or minorities. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 280, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976)." *Trans World Airlines, Inc. v. Hardison,* —— U.S. ——, at ——, 97 S.Ct. 2264, at 2270, 53 L.Ed.2d 113 (1977).

made an unlawful employment practice by this Title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Title."

■ Even though the original charge of racial discrimination in the denial of a promotion is without merit, if Dr. Thomas was terminated because of her having participated in any manner in such a charge with the EEOC, she would be entitled to relief.

The plaintiff's main argument is that the 1975 review of Dr. Thomas on the issue of contract renewal following the filing of the EEOC charge of 1974 was an extraordinary review in its procedural and substantive aspects, that it contrasted with favorable reviews in 1974 prior to the filing of the charge with the EEOC, and that Dr. Thomas had no prior notice of any deficiencies in her conduct.

As to the first point, the court, as set forth in the factual part of this Opinion, concludes that the 1975 review was not extraordinary in any respect. She was reviewed on the question of contract renewal, pursuant to the specific provisions of her standard contract which all Assistant Professors at UMBC had at that time. The Committee which reviewed her did not review her alone, but reviewed every other history faculty member similarly situated as to rank and date of employment.

From all the credible evidence, the court has concluded that Dr. Thomas did not participate in the affairs of the Department to the extent expected of members of the history faculty. Without question, there was discontent among the history faculty members as to the original terms of employment of Dr. Thomas. That discontent was not based upon her race, but upon what the faculty viewed as a procedurally and substantively unprecedented contract. Dr. Thomas, perhaps understandably, interpreted the statements and actions of some members of the faculty as being racially motivated. Perhaps this is an explanation for the fact that she did not participate in the Department affairs as fully as she might otherwise. The fact remains, however, that she did not participate in the affairs of the Department to the extent required of all members of said Department.

Both Dr. Arnold and Dr. Levine in 1973 and in 1974 advised Dr. Thomas that her service to the Department, as contrasted to her service to the University and the Division of Social Sciences, was perceived as being inadequate. The plaintiff's own witness, Dr. Levine, testified that she did not participate in the affairs of the Department in the manner expected of such a member.

The court found the testimony of Dr. Arnold to be particularly persuasive. Dr. Arnold had worked actively in community organizations for the advancement of civil rights, had campaigned for the election of Parren Mitchell, a black Congressman from Baltimore City, and was keenly interested in the hiring of more black faculty members. He has two biracial children of his own and had, he testified, personal interest, therefore, in fostering civil rights and equal opportunity for all.

Dr. Arnold testified that he not only advised Dr. Thomas to participate more fully in departmental affairs, but he also told her on a number of occasions that she should complete the peer teaching evaluation process. He stated that the 1975 Departmental P and T Committee decided that it could not endorse her teaching, one of the three criteria, because she had not completed the peer evaluation process. In emotional and highly persuasive testimony, Dr. Arnold said that although his first vote was to recommend termination, he changed his vote to extend her on a one-year contract because, he said through tears, "I just could not fire a black person."

■ The court has concluded that the Departmental and Divisional P and T Committee recommendations in 1975 were based upon the perception that Dr. Thomas had not complied with or met the standards applicable for retention in the History Department at the rank of Assistant Professor after the expiration of her initial three-year term in that rank. The decisions of the

Departmental and Divisional P and T Committees in 1975 were not based upon racial animosity nor upon the fact that a claim of discrimination had been filed in her behalf with the EEOC. The decisions of Dean Graham, Dr. Baratz, and Chancellor Lee similarly were made based upon their perception of what was best for the University and were not based upon racial animosity nor in retaliation for the claim of discrimination which had been filed with the EEOC.

For all the above reasons, Judgment will be entered for the defendants.